Dorsey *vs.* Thompson, *et al.*

(Decided 4th December, 1872.)

---

JOHN T. B. DORSEY *vs.* MARY A. T. THOMPSON AND OTHERS.

*Alien Enemy—Liability of a person, while within the Confederate lines, to be proceeded against by an Order of Publication, granted by a Court in Maryland—Presumption of Notice from the due publication of the Order of Publication—Purchasers under an Order of Court protected in their Titles—Power of a Court of Equity, under Article 16, section 66, of the Code, to appoint a Trustee to sell in certain cases—Removal of a Trustee and substitution of another by a Court of Equity—Right of a Mortgagee to assert his claim to the Proceeds of the Sale of the Mortgaged property—Judgments when brought into question Collaterally—An Order in Equity, not Final.*

While an alien enemy is incapable of suing and maintaining a suit, either at law or in equity, in the Courts of the country to which he is hostile, during the state of hostilities, he is liable to be *sued*, if within the reach of·process.

Dorsey *vs.* Thompson, *et al.*

A resident citizen of Maryland, who, after hostilities had commenced between the United States and the Confederate States, voluntarily left his home, and went to Virginia one of the Confederate States, and afterwards joined the Confederate army, may be proceeded against by order of publication, granted by a Court in Maryland, and he is bound by the proceedings taken in the cause, as any other non-resident defendant would be, notwithstanding that he was at the time within the Confederate lines, and could not in fact receive the notice by publication.

The presumption of notice, resulting from the due publication of the order of Court, is such as to confer upon the Court power and jurisdiction to decree upon the subject-matter of the suit, that subject-matter itself being within the jurisdiction of the Court.

Where a Court of Equity, having jurisdiction, passes an order directing the sale of real estate, the purchasers of such real estate are entitled to be protected, and a reversal of the order of sale would not operate to disturb their titles acquired under it.

Where a testator directed that all his real estate, not specifically devised, should be sold by his executors, and a sale thereof was necessary to the due execution of the trusts created by the will, and before the power of sale was completely executed, one of the executors died, and the other went beyond the jurisdiction of the State, a Court of Equity has the power under the provisions of Art. 16, sec. 66, of the Code of Public General Laws, upon a bill filed by the *cestuis que trust* under the will, to appoint a trustee to sell the land remaining unsold, and convey the same, and apply the money arising from the sale in execution of the trusts declared in the will.

Where a trustee under a will leaves the State, and the prospect of his return is remote and contingent, a Court of Equity may, upon the application of the *cestui que trust*, remove such trustee and appoint another in his stead, being satisfied that such removal and appointment are necessary to the preservation of the trusts declared in the will.

Upon a bill filed by parties interested as *cestuis que trust*, certain real estate was sold free of a mortgage incumbrance, the mortgagee being a party defendant to the proceedings, and assenting to the sale as prayed in the bill. The mortgage debt was overdue. The event had long before occurred upon which, by express stipulation, the mortgagee was authorized and empowered forthwith to foreclose the mortgage, and to sell the property embraced in it, and to apply the proceeds of sale to the extinguishment of the mortgage debt. HELD:

That the mortgagee having consented to the sale, was entitled to assert his claim to the proceeds, and have them applied according to the terms of the mortgage.

The correctness of judgments coming before a Court collaterally, cannot be questioned.

A Court of Equity by its order of the 7th of April, 1871, suspended the further execution of a previous order of sale of certain real estate, passed on the 6th of January, 1864, until further direction, and ordered a subpœna to issue to the appellant, (one of the defendants in the proceedings,) commanding him to appear and answer the bill by a day named. This subpœna though duly served was not obeyed, and upon application of the complainants, the Court on the 21st of September, 1871, passed an order, whereby the trustee appointed by the first order of sale was continued, and ordered to proceed to sell the remainder of the real estate ordered to be sold, "as if his power and authority in the premises had not been suspended by the order of the 7th of April, 1871, last." HELD:

That the order of the 21st of September, 1871, was in no proper sense a final decree; it was simply a renewal and continuation of the former order of sale; and was authorized by the same power and jurisdiction that authorized the passing of such former order.

APPEAL from the Circuit Court for Howard County, in Equity.

This was an appeal from the following orders of the Court below: The order of the 6th of January, 1864, decreeing the sale of the real estate mentioned in the complainant's bill, as the residue of the real estate remaining unsold, of the late Thomas B. Dorsey, and appointing James Mackubin trustee to make the sale; the order of the same date, removing John T. B. Dorsey, as trustee of Mrs. Mary A. T. Thompson, and appointing Priscilla M. Dorsey in his stead; the order of the 16th of August, 1864, ratifying the sales reported by James Mackubin, as made on the 18th of May and the 1st and 2nd of June, 1864; the order of the 20th of December, 1864, ratifying the auditor's report and account; the order of the 4th of December, 1866, ratifying the report and account of the auditor; the order of the 15th of November, 1864, ratifying the sale to James S. Gary; the order of the 7th of April, 1871, suspend-

ing the further execution of the order of sale of the 6th of January, 1864, until further direction, and ordering a subpœna to issue to the appellant, commanding him to appear and answer the bill by a day named; and the order of the 21st of September, 1871, continuing James Mackubin, the trustee appointed by the first order of sale, and directing him to sell the remainder of the real estate ordered to be sold, "as if his power and authority in the premises had not been suspended by the order of the 7th of April, 1871." The facts of the case will sufficiently appear from the opinion of the Court and the arguments of counsel.

The cause was argued before BARTOL, C. J., STEWART, BOWIE, BRENT, ALVEY and ROBINSON, J.

*Levin Gale* and *Louis T. Wigfall*, for the appellant.

On the same day that the bill in this case was filed, an order was passed by the clerk directing publication against John T. B. Dorsey, Samuel W. Dorsey, and against Dorsey Thompson, Gilbert L. Thompson, Jr. and Edward L. Thompson, (children of the complainant, Mary A. T. Thompson,) all of whom the bill alleged to be non-residents—warning them to appear in person or by solicitor on or before the 1*st day of May next ensuing*, (*i. e. on* 1*st May*, 1864,) to shew cause, &c. And at the same time a subpœna was issued for the other-defendants, numbers of whom were infants, returnable on the 21st of March, 1864. On the 4th of January, 1864, John T. W. Dorsey, (not John T. B.) and also Comfort W. Dorsey, separately appeared and answered for themselves respectively. On the 6th of January, 1864, none of the other defendants having appeared or answered, and neither the time for the return of the subpœna, nor the time for the appearance of the absent defendants having expired, the Court without any evidence other than the

will and administration accounts, passed an order direct-
ing the sale of the whole of the residue of the real estate
of the late Thomas B. Dorsey, in which was included
one-fifth, belonging absolutely to John in his own right,
and without any allegation in the bill, that it was in-
capable of advantageous partition. In point of fact it
was susceptible of division with great advantage. None
of the defendants, except the two above named, appeared
according to the exigency of the subpœna or order of pub-
lication. No interlocutory decree was obtained against
them, nor decree *pro confesso* had.

In May and June, 1864, various sales of different
tracts of land were made, which were reported to the
Court and ratified. In June and September, two sales,
amounting in the aggregate to $13,845.75, were made
by the trustee *privately,* and reported to the Court *and
ratified without an order nisi,* upon the consent of J. T.
W. Dorsey, and Comfort W. Dorsey, none of the other
defendants having appeared or answered, (except the
infants,) or consented to the sale or ratification.

On the 15th of September, 1864, after these various
sales had been made, a commission to take testimony was
issued and returned a few days afterward. The only
important evidence offered was to shew the heirship of
the parties—the accounts passed before the Orphans'
Court in relation to the estate of Thomas Beale Dorsey,
and the fact that John T. B. Dorsey, (the present appel-
lant,) was in Richmond, Virginia. One of these Or-
phans' Court accounts was passed by Comfort W. Dor-
sey, widow and executrix of William H. G. Dorsey, in
which it is alleged that she passes it on behalf of her-
self as executrix of William and John T..B. Dorsey, he
"being in the State of Virginia, and, as it is believed,
in the Confederate service."

Without any further order or proceedings, and still
without the appearance of the other defendants, and

without any decree, either interlocutory or *pro confesso*, the auditor apparently of his own motion, states an account, distributing the proceeds of the various sales—in which he makes allowances against John T. B. Dorsey, not in any matter growing out of the common interest of the parties to this proceeding, but out of some alleged attachments in other causes, none of which are shown to be connected with this cause. This report was made on the 2d of December, 1864, and ratified by the Court on the 20th of the same month, without any order *nisi*, although by the rules of the Court it was required to lay at least one term.

Afterwards, on the 17th of January, 1865, a further sale was made *privately*, amounting to $2,157.50, and on the following day ratified by consent of the two defendants before named, no order *nisi* having been obtained; and the proceeds were distributed as before, by the auditor, without further order or decree, and ratified without any preliminary notice or order.

In June, 1868, James Mackubin, who claimed to be trustee under the order of sale heretofore mentioned, filed a petition, which alleged, that he had been resisted and obstructed in his efforts to sell through the interpositions of John T. B. Dorsey, who when the proceedings in this cause were instituted, "resided within the limits of the so-called Confederate States;" that said Dorsey returned to this State sometime in the summer of 1865, and since his return, had instituted actions of ejectment against each and every one of the parties, (except his sister Eliza,) who purchased of the petitioner, and had also instituted a like action of ejectment against the petitioner, for the recovery of the only parcel of land remaining unsold. The petition invoked the protection of the Court, and prayed that said Dorsey might be enjoined from the further prosecution of his action against the petitioner, and from all manner of interference with him in the discharge of the trust devolved upon him.

Dorsey *vs.* Thompson, *et al.*

A copy of this petition, and an order to answer it having been served on John T. B. Dorsey, he, in obedience to the exigency of said order, filed an answer to the petition, denying that he was a party to the cause or bound thereby—and setting up other reasons why the order prayed for should not be passed. The petitioner abandoned the proceeding, and nothing whatever was done under it.

On the 17th of March, 1871, the same alleged trustee, James Mackubin, filed a further petition asking the Court what he should do. To this petition and to the last preceding one, there were no parties, except the alleged trustee and the defendant, John T. B. Dorsey. Upon this petition, without the application of a single party to the cause, the Circuit Court, on the 7th of April, 1871, passed an order reciting that the case had been finally decreed upon, except as to the property remaining unsold, and that as to that, (although John T. B. Dorsey, had denied that he was a party, and pleaded substantially to the jurisdiction in the cause, and that question had never been submitted to or decided by the Court,) he should be summoned to appear to the original bill and answer. He did not do so. Without any interlocutory decree or decree *pro confesso*, the decree from which this appeal is taken was passed.

The proceedings in the cause were so irregular and defective, that they were entirely out of the jurisdiction of the Court which undertook to act upon them. But whether that be so or not, upon this appeal the Court must reverse the proceedings since this case comes up on appeal from the last decree or order passed; and opens up, not only the question of jurisdiction, but also the regularity of the proceedings —Code, Art. 5, sec. 22.

The bill in this case was not a proceeding strictly *in rem*. It did not describe any particular property; and there was no levy, schedule appraisement or return of it.

It only *attacked* the land *through* the parties. If the absent defendants had not been made parties no decree could have bound their interests.—Code, Art. 16, secs. 88 and 98. The section 129 of same article, authorizing a sale before final decree, must be taken as subject to and qualified by sections 88 and 98—they being in *pari materia. Hollingsworth vs. Barbour, et al.,* 4 *Peters,* 466; *Harris vs. Hardeman,* 14 *Howard,* 343; *Clark & Jackson vs. Bryan & Lunt,* 16 *Md.,* 178; *Woodruff vs. Taylor,* 20 *Vert.,* 66-72; *McKim vs. Mason,* 3 *Md. Ch. D.,* 212.

There were no interlocutory decrees.—Art. 16, sec. 115. Nor decrees *pro confesso.*—Art. 16, secs. 116 and 120; nor attachment for contempt.—Art. 16, sec. 118.

There were no final decrees within the meaning of the 129th section of Article 16 of the Code. The ratifications of sales are irregular, as also the auditor's reports, and do not amount to final decrees.

At the time of the institution of this suit, and up to the conclusion of the late civil war, John T. B. Dorsey and other of the defendants, as appears by the proceedings in the case, were alien enemies, and could not be sued, nor could any notice of publication be given to them. *Mrs. Alexander's Cotton,* 2 *Wallace,* 419; 1 *Kent Com.,* 62-68; *Life Ins. Co. vs. Hall, Amer. Law Reg. August,* 1868; *President's Proclamation, August,* 1861; *Johnson vs. Robertson,* 34 *Md.,* 165; *Dean vs. Nelson,* 10 *Wallace,* 158; *Ludlow vs. Ramsay,* 11 *Wallace,* 581; *McConnell vs. Hector,* 3 *Bos. & P.,* 114; *The Kanawha Coal Co. vs. The Kanawha and Ohio Coal Co.,* 7 *Blatch. C., C.,* 409.

The alleged notice by publication to the absent defendants, not only did not give them notice, but lulled them into a false security, which was worse than no notice. *McKim vs. Mason,* 3 *Md. Ch. Dec.,* 211; *Regents of the University of Maryland vs. Williams,* 9 *G. & J.,* 408; *Penobscot Railroad Company vs. Weeks,* 52 *Maine,* 456;

*Shriver's Lessee vs. Lynn*, 2 *Howard*, 59; *Mears vs. Remare*, 33 *Md.*, 246.

*James Mackubin*, for the appellees

On the 1st of November, 1871, an appeal was entered from the order or decree of the 21st of September, 1871, and from all prior orders in the proceedings.

All prior orders (save that of the 7th of April, 1871,) were passed more than nine months before the appeal was taken, and are therefore too old now to be reviewed. Code, Art. 5, sec. 20.

As to them, the appeal would seem to have been based upon that part of section 22 which provides, that "on an appeal from a final decree or order, all previous orders which may have passed in the cause shall be open for revision." But that general provision is limited by the concluding paragraph, "unless an appeal under the next preceding section may have previously been taken to such order:" not *has* been, but "*may have* been." Now, if these previous orders are such as, under section 21, an appeal "may have" been taken from them, then they cannot be revised on this appeal. That they are such there can be no doubt. *Jones and wife, et al., vs. Plummer*, 20 *Md.*, 420.

Again, neither the order of the 7th of April, nor that of the 21st of September, is "a final decree or order" *in respect to the sales previously made*, or *to the distribution of the proceeds*, or *to the removal* or *appointment of trustees*. Neither of them has any reference whatever to either of those matters. They relate *exclusively to the sale of the unsold parcel of land*. The decretal orders ratifying the auditor's accounts were the *only final* orders or decrees that were, or *could be*, in respect to former sales; (*Dorsey vs. Dorsey*, 30 *Md.*, 530;) and they were all passed more than nine months before this appeal. As to the removal or appointment of trustees for the appellant's

sisters, no "final decree or order" has been passed to
this hour.   Those passed were provisional only, and still
remain so, *a standing invitation to the appellant to come
in upon his merits*, and ask for their rescission.

If there were any error in the two orders last passed,
it was in the too great forbearance which they showed
towards the appellant—too great, because it involved
continued and protracted deprivations and losses to the
*cestuis que trust*—sisters of the appellant—one a married
woman—all, the peculiar and especial *wards* of a Court
of Equity; too great, because they failed properly to
vindicate the authority of the Court itself, and exposed
its own officer, while executing its commands, (and for
which it held him responsible in a penalty of $50,000.00)
to an interference and opposition as frivolous as it was
vexatious.

In reply to the defence that the Court below had no
jurisdiction, because the appellant was within the Con-
federate States, at the institution of the proceedings, and
until the close of the war, it may be remarked, that this
was not a proceeding to enforce against the appellant any
contract, or to divest him of his estates.   It was only to
carry out the trusts under the will of Judge Dorsey.
For *such a purpose* it is not a necessary pre-requisite *in
every case and under all circumstances*, that the trustee be
summoned or notified.   If the trust estate be suffering
therefrom, the very fact *that he is beyond the process of
the Court, and cannot be made amenable to its authority*,
would alone suffice for his removal, and the appointment
in his stead, of other agents to execute the trusts.   Volun-
tary or involuntary, it is *an abandonment of the trust*,
which demands the interposition of equity.   2 *Story's
Eq. Jur.*, secs. 1287-8-9.

It would be monstrous to hold that a trust estate must
be left to decay and perish, and the *cestui que trust* to
suffer want, because the trustee may have put himself, or

Dorsey *vs.* Thompson, *et al.*

by the chances of war or otherwise, have been placed where it was impossible for him to execute his office, and equally impossible for him to be reached by any process of the Court.   What manner of advantage could such a rule work to trustee or any one else?   It would ·be repugnant to every sentiment of natural justice as regards the *cestui que trust*    And no exigency of Government or State could possibly require it.

Moreover, no objection to the jurisdiction can be heard in this Court, since none was made in the Court below. *Art.* 5, *sec.* 27, *of the Code; Ashton vs. Ashton, et al.,* 35 *Md.,* 502.

*Henry Stockbridge,* intervening for the Gary Manufacturing Company as grantee of James S. Gary, and owner of a part of the property mentioned in these proceedings, argued that the appeal should be dismissed :

The order of the 17th of September, 1871, was not a "final decree, or order in the nature of a final decree," from which an appeal must be allowed.—Article 5, section 20, of the Code.

It was not an order or decree that finally settled any disputed right or interest of the parties.   *Ware vs. Richardson,* 3 *Md.,* 555.

The order of the Court passed at the instance of the trustee, on the 7th of April, 1871, suspended his right to act until further order of the Court.   It decided nothing. Out of too tender regard to the caprice of the appellant it directed all proceedings stayed, and proffered him an opportunity to show cause, if there were any, why proceedings should not be had to promote the interest of the *cestui que trust.*   Having no reasons to give, he gave none, and the Court then removed the order of suspension.   The Court did not then appoint a trustee or order a sale, it merely revoked its suspension of his authority, and recognized as valid its decree of the 6th of January,

1864, by which the sale was decreed, and the trustees appointed. It was seven years too late to appeal from that decree, and it was only under that decree that the trustee had authority to act, after the order of September 21, 1871. It was under that, that his bond was given, and from that, that his power and authority to sell in the premises, is derived, "as if the same had not been suspended by the order of April 7th." The order of September 21st being therefore only a removal of an order of suspension of proceedings on the part of the trustee, is not a final decree from which an appeal will lie.

If the order of September 21st, 1871, be in any sense a "final decree, or order in the nature of a final decree," then *a fortiori*, was the decree of January 6th, 1864, a final decree and as such could be brought before this Court only by an appeal taken on or before October 6th, 1864. The order of September 21st, 1871, created no trustee, directed no sale, conferred no power or authority upon any trustee which was not done quite as amply by the decree of January 6th, 1864. If *this* were sufficiently a final decree to sustain an appeal, *that* was sufficiently a final decree to require the appeal to be taken "within nine months from its date, and not afterwards."

On the one ground or the other, therefore, this appeal should be dismissed. If the order of September 21st, 1871, was not a final decree, then an appeal from it will not lie; and if it were a final decree, then by the same token was the decree of January 6th, 1864, a final decree which could be inquired into only on an appeal taken within nine months. Such an appeal was not taken and the decree therefore can never be disturbed afterwards.

Whether the decree of January the 6th, 1864, taken by itself was or was not a "final decree," there can be no doubt that the final order of ratification of sale passed on the 15th day of September, 1864, taken in

connection with the order of December 20th, 1864, whereby the proceeds of the sale, so ratified, were distributed among the parties to this suit, and the distributing audit was "finally ratified and confirmed," was a final decree within the meaning of the statute, and cannot be disturbed by any subsequent proceedings in the same case, affecting other portions of the trust estate.

The rights of the parties, not only to the property decreed to be sold, but in and to the proceeds of the sale, were then adjudicated and concluded. It was the final decree contemplated by the statute. From it an appeal taken within nine months would lie; and if not taken then, it could not be taken afterwards, *directly.* If it could not be taken directly, much more could it not be taken indirectly as an adjunct or attachment to an appeal taken in another branch of the case—an appeal applicable only to another part of the trust property and estate.

The term "final decree," in the statute does not necessarily mean the last decree that can be passed in a cause; there may be in a cause many decrees which are *"final decrees,"* within the meaning of this section of the Code.

But the decree of September 21st, 1871, removing the order of suspension of the 7th of April, if construed as a decree affecting the rights of the parties, must be construed as a decree passed *pro confesso,* or when the appellant was in contempt by refusing to appear or answer. It must have been passed upon the "bill and all the other proceedings," which were "read and considered" by the Court, and the appellant cannot now be heard to declare errors or irregularities which he persistently refused to present in the Circuit Court.

The ruling of this Court in *Dorsey's Lessee vs. Gary,* 30 *Md.,* 489, and in *Dorsey vs. Dorsey,* 30 *Md.,* 522, fully sustain the validity of the proceedings in this cause, if tried upon its merits as disclosed in the record.

ALVEY, J., delivered the opinion of the Court.

Much of the argument in this case, on the part of the appellant, has been addressed to the question, whether, at the time of the institution of this suit, and during the period within which certain proceedings were had, of which he now complains, he was liable to be sued in the Courts of this State, he being at the time, as he alleges, an alien enemy of the Government of the United States, and, consequently, of the State of Maryland.

It has been very zealously argued by the appellant's counsel, that, inasmuch as the appellant left his residence in this State and joined the Confederate army, before the institution of the suit, and remained within the Confederate lines until after the close of the war, his *status* was that of an alien enemy to the Government of the United States, and that, as a legal consequence of such *status*, he was not liable to be sued in the Courts of the country against which he was engaged in hostility. That during the state of war all right of action by those remaining in the country to which he was hostile was suspended as against him, and that, consequently, the proceedings taken in this case, so far as they attempt to affect him, were without warrant of law, and are, therefore, nugatory and void.

Now assuming, for the sake of the argument, that the appellant's *status* was that of alien enemy, as he contends, does it follow, as a necessary legal consequence, that he was exempt from all liability of suit in the Courts of the belligerent country, by the citizens and friends of that country, to affect his rights and estate remaining within its jurisdiction? To maintain this proposition, so sweeping, and so disastrous in its consequences to the rights of the friendly citizen of the country whose Courts are invoked for relief, no authority whatever has been produced, nor are we aware of any established principle upon which it can be maintained. On the contrary,

reason and convenience would seem strongly to militate against it.

It is certainly true, that an alien enemy is incapable of suing and maintaining a suit, either at law or in equity, in the Courts of the country to which he is hostile, during the state of hostilities; but this disability is personal to the plaintiff, and is designed to take from the enemies of the government the benefit of its Courts. *Daubigney vs. Davallon*, 2 *Anst.*, 462; *Sparenburgh vs. Bannatyne*, 1 *Bos. & Pul.*, 163; *Society, &c. vs. Wheeler*, 2 *Gall.*, 105; 1 *Daniel Ch Pra. and Plea.*, 58; *Story's Eq. Pl.*, sec. 53. There may be auxiliary reasons for the rule founded on policy; but in reference to this Judges have not agreed in opinion. In the case of *Sparenburgh vs. Bannatyne*, 1 *Bos. & Pul.*, 170, Chief Justice EYRE, in speaking of the ground upon which the plea of alien enemy is founded, said: "As to the ground of policy which has been taken in argument for the defendant, namely, that a benefit would result to the enemy from the plaintiff's recovering, it is a policy, perhaps doubtful, certainly remote, and which I do not hold to be satisfactory. I take the true ground upon which the plea of alien enemy has been allowed is, that a man, professing himself hostile to this country, and in a state of war with it, cannot be heard if he sue for the benefit and protection of our laws in the Courts of this country. We do not allow even our own subjects to demand the benefit of the law in our Courts, if they refuse to submit to the law and jurisdiction of our Courts. Such is the case of an outlaw." The plea of alien enemy, however, is greatly disfavored by the Courts, and all presumptions are generally indulged against it; (8 *T. Rep.*, 166; 2 *Gall.*, 127; and where the disability of alien enemy occurred before judgment, and to a *scire facias* on the judgment the plaintiff's disability was pleaded, the plea was disallowed because it had not been availed of to the original

action; the plaintiff having been allowed to recover judgment, his disability could not be set up to defeat execution on it. *West vs. Sutton*, 2 *Ld. Raym.*, 853. The defence is technical, and is only allowed when formally and strictly pleaded to the maintenance of the suit. 1 *Chit. Pl.*, 234.

But whether the ground of the defence of alien enemy be the possible benefit that might result to the enemy from allowing the plaintiff to recover, or the want of claim or right to the use of the Courts of the country by the plaintiff, in consequence of his *status* as an enemy, the reason that creates the disability of the party as plaintiff does not apply to him as defendant. As plaintiff, the party attempts to exercise a privilege that he has forfeited, at least for the time; but, as defendant, he is sought to be made amenable for what justice may require of him. The mode and manner of acquiring jurisdiction, and making the proceedings binding on him, is another and a different question from that of his total exemption from suit pending hostilities. This depends upon the remedial processes of the Courts; and, as is well known, they are generally wholly inadequate during a state of actual war in suits *in personam*, to furnish the foundation for exercising jurisdiction over alien enemies residing in the enemy's territory. But still these enemies are liable to be sued, if within the reach of process.

Indeed, that an alien enemy is liable to be sued in the Courts of the hostile country would seem to be a settled principle of law. It has been so expressly decided by this Court in the case of *Dorsey vs. Kyle*, 30 *Md.*, 512; and it has been recently so decided by the Supreme Court of the United States, in the case of *McVeigh vs. U. S.*, 11 *Wall.*, 259, 267. In this latter case, the Court said: "Whatever may be the extent of the disability of an alien enemy to sue in the Courts of the hostile country, it is clear that he is liable to be sued, and this carries

with it the right to use all the means and appliances of defence." *Bacon's Abr.*, *tit. Alien, D.*, is quoted from, in which it is said that an alien enemy may be sued at law, and may have process to compel the appearance of his witnesses. See also *Albretcht vs. Sassmann*, 2 *Ves. & B.*, 323.

Having thus shown that, conceding the legal *status* of the appellant to be that of an alien enemy, there is nothing in that *status* to exempt him from suit in the Courts of this State, except the difficulty of rendering him amenable to the process of the Courts, we shall now proceed to examine the nature of the case and the manner in which jurisdiction was acquired by the Court to pass the several orders of which the appellant complains on this appeal.

The bill in this case was filed on the 3d of December, 1863, by three of the daughters of the late Chief Justice Thomas B. Dorsey, against the appellant and others; its objects being, 1st. To obtain an account of the estate of the deceased from the surviving executor and trustee, John T. B. Dorsey, the appellant, and the executrix of Wm. H. G. Dorsey, deceased, who was co-executor and trustee with the appellant, under their father's will; 2d. For the removal of the appellant from his position of trustee, because of his absence from the State, and consequent neglect of the trusts, and to have other trustees appointed; and, 3d. To obtain a decree for the sale of all the residue of the real estate of the testator, the late Judge Dorsey, not specifically devised; the proceeds to be distributed according to the devises, directions, and trusts set forth in the will. The appellant was the devisee of the one-fifth part of all the residue of the real estate, thus prayed to be sold; and, by a separate clause in the will, the two executors were authorized and empowered to sell, at such time as they should deem it expedient or necessary, all the real and personal estate of

their testator that had not been specifically devised or bequeathed by his will. This power had been but partly executed; a considerable portion of the residue of the real estate remaining unsold at the time of filing the bill. The three daughters, complainants, were each entitled to one-fifth of this residue of the testator's estate, to be held in trust, and invested for their use and benefit; the appellant being the trustee appointed by the will to hold and invest the one-fifth for his sister, Mrs. Thompson, one of the complainants. To fully execute these trusts created for the three daughters, it is apparent that all the lands embraced in the power of sale were required to be sold, and that such was the design and intention of the testator. There had been a failure to execute the power, and one of the executors was dead, and the other absent beyond the jurisdiction of the State, at the time the bill was filed. The appellant was alleged to be a non-resident, and was proceeded against as a non-resident defendant, by order of publication in the usual form, and as authorized and directed by the statute law of the State. The order was duly published once in each of four sucsive weeks before the 1st of February, 1864, as required, warning the appellant, and other absent defendants, to appear and answer on or before the 1st of May, 1864. This order of publication was not heeded by the appellant, because, as he alleges, he was, at the time, within the lines of the Confederate States, a power at war with the United States, and that it was unlawful for him either to receive or obey the notice thus attempted to be given; and that, consequently, all the proceedings had in the cause, so far as he is concerned, are without effect and void, the Court failing to acquire jurisdiction to decree against him.

This position of the appellant would be entirely correct and unanswerable, if he had been a citizen or resident of any of the Confederate States at the commencement of

the war. But that was not the case with the appellant. At the commencement of the war he was a resident citizen of this State; and it was not until about the 1st of July, 1861, and after hostilities had commenced, that he voluntarily left the State and went to Virginia, one of the Confederate States, and afterwards joined the Confederate army. These facts are fully disclosed in records brought into this Court by the appellant himself, in one of which was involved the validity of the order of sale passed in this cause. *Dorsey vs. Garey*, 30 *Md.*, 489; *Dorsey vs. Kyle*, 30 *Md.*, 512; *Dorsey vs. Dorsey*, 30 *Md.*, 522.

On these facts appearing in the case of *Dorsey vs. Dorsey*, just referred to, this Court decided that the appellant was subject to the notice given by publication, and that he was bound by the proceedings taken in the cause, as any other non-resident defendant would be, notwithstanding his allegation that he was at the time within the Confederate lines, and that he could not in fact receive the notice. That the presumption of notice, resulting from the due publication of the order of Court, was such as to confer upon the Court power and jurisdiction to decree upon the subject-matter of the suit, that subject-matter itself being within the jurisdiction of the Court. Indeed, without such presumption and such power, the rights of creditors, and the rights of *cestuis que trust*, would, in many cases, be utterly sacrificed and lost.

Subsequently, the case of *Johnson vs. Robinson & Pearre*, 34 *Md.*, 165, came into this Court, and in that case was involved the validity of a notice by publication, the defendant intended to be affected by it having left the State, and being at the time engaged in the Confederate service. The notice there was held to be ineffectual; but it was so held in deference to and upon the authority of the decision of the Supreme Court of the

United States, in *Dean vs. Nelson*, 10 *Wall.*, 158, where the doctrine was announced, without limitation or qualification, that such notice, to affect a party so situated, was an idle form, and therefore a mere nullity. By a more recent decision, however, of the same learned tribunal, the principle of the case of *Dean vs. Nelson* has been materially modified; and the doctrine as last announced, in *Ludlow vs. Ramsay*, 11 *Wall.*, 581, is, that notice by publication is effectual, when duly authorized and regularly given, as against a party voluntarily absenting himself from his home within the Federal or Union lines, and going into the Confederate lines to engage in hostilities against the government of his domicil. The Court say, at p. 589 of the Report: "But if, as in this case, a party voluntarily leaves his country or his residence for the purpose of engaging in hostilities against the former, he cannot be permitted to complain of legal proceedings regularly prosecuted against him as an absentee, on the ground of his inability to return or to hold communication with the place where the proceedings are conducted. That would be carrying the privilege of *contra non valentem* to an unreasonable extent."

Taking this as the proper announcement of the law, (and from the nature of the question itself it is obvious that there is great propriety in making the decisions of the State Courts conform to it,) there can be no question but that the notice given in this case was effectual, and that the Court below was authorized to proceed as it could have done in any other case of a non-resident defendant, against whom notice had been duly published.

Having disposed of these general propositions which were supposed to be involved in the case, we come now to consider the several orders that were passed in the course of the proceedings in the Court below. And assuming, without deciding, that they are all open for review on this appeal, we shall consider them in the order in which they were passed.

1. The first of these orders is that of the 6th of January, 1864, directing a sale of the real estate, prayed to be sold. The question of the jurisdiction of the Court to pass this order has been heretofore determined by this Court, in the case of *Dorsey vs. Garey*, before referred to. The only other question that can now be presented, is, whether the jurisdiction was properly exercised? But looking to the nature of the order, and the subsequent proceedings in the cause, we fail to discover in what respect the appellant can be benefitted by its reversal, if ground could be shown upon which such reversal could be asked. Inasmuch as there was jurisdiction in the Court to pass the order, it is clear beyond all doubt, that the purchasers who have acquired titles under it, are entitled to be protected and that a reversal of the order would not operate to disturb those titles. *Chase vs. McDonald & Ridgely*, 7 *H. & J.*, 161, 199 ; *Magruder vs. Peter*, 11 *Gill & John.*, 217, 242 ; *Johnson vs. Robinson & Pearre*, 34 *Md.*, 165, 173 ; *Bank U. S. vs Bank of Washington*, 6 *Pet.*, 8. But there is nothing disclosed by the record to render it improper in the Court to pass this order of sale. On the contrary, the lands were required to be sold, in order to the due execution of the trusts in favor of the complainants. The testator himself had directed that they should be sold ; and notwithstanding eight years had elapsed since the testator's death, his estate had not been fully administered, and the power of sale had only been partly executed. One of the executors was dead, and the other beyond the jurisdiction of the State. The Court, therefore, could well declare in the order that it was fully satisfied that at the final hearing a sale of the lands would have to be decreed.

As to the power to appoint a trustee to make the sales, there can be no doubt of its existence, as one of the general inherent powers of a Court of Chancery. But, independently of the general power of the Court, the

Code, Art. 16, sec. 66, provides that where any person dies, leaving real or personal property to be sold for the payment of debts, *or other purposes*, and shall not appoint any person to sell and convey the same, or if the person appointed dies, *or neglects or refuses to execute such trust*, the Court, upon the petition of any person interested in the sale of such property, may appoint a trustee to sell and convey the same, and apply the money arising from the same to the purposes intended   This provision of the Code embodies the 4th section of the Act of 1785, ch. 72, and would seem fully to embrace this case, as to the appointment of a new trustee to make the sale. The proceedings under this provision of the statute have generally been of a summary nature, and most generally *ex-parte*. *Hammond vs. Hammond*, 2 *Bl'd*, 221, *and cases in notes, on pages* 221, 222 *and* 223 ; *Deakin's case*, 2 *Bl'd*, 398 ; *Shriver's Lessee vs. Lynn*, 2 *How.*, 43, 60.

The sales being authorized by the order, and there being nothing in the record to impeach their fairness, it follows of course that the Court was right in finally ratifying them, as they were reported by the trustee.

2. The order next to be considered is that also of the 6th of January, 1864, removing the appellant as trustee for his sister, Mrs. Thompson, under his father's will, and the appointment of another person in his stead. It is declared in the order that it appeared to the Court that such removal and appointment were necessary for the preservation of the trusts declared in the testator's will. If such was the exigency of the trust, and we see nothing to the contrary, it was clearly the duty of the Court to act promptly for its protection. It is one of the first maxims of a Court of Equity that a trust shall never fail or suffer for the want of a trustee to support and execute it. It is a principle equally well established that the Court, in cases requiring such remedy, will remove one trustee and substitute another. Indeed, says Judge

STORY, (2 *Eq. Jur.*, sec. 1287,) "the appointment of new trustees is an ordinary remedy, enforced by Courts of Equity in all cases, where there is a failure of suitable trustees to perform the trust, either from accident, or from the refusal of the old trustees to act, or from their original or supervenient incapacity to act, or from any other cause." And so, Mr. Hill, in his work on Trustees, side p. 191, says, that "where the circumstances or conduct of any existing trustee render it inexpedient for him to continue in the office, the Court will adapt its relief to the exigencies of the case, and having first decreed the removal of the trustee, will then proceed to supply the vacancy by appointing another person to act in the trust, and by directing the conveyance or transfer of the trust property to him."

"Thus this relief has been decreed, where the original trustee or trustees declined to act; or were desirous of being discharged; or had absconded; or were incapable of acting through age and infirmity; or could not discharge the trust through disagreement amongst themselves; or had been guilty of breaches of trust; or become bankrupt." The same general doctrine is very fully asserted in the case of *Comegys vs. The State, use of Dyckes*, 10 *Gill & John.*, 183, 184, where it is said that the removal of a trustee from the jurisdiction of the State may imperiously demand the substitution of a new trustee.

Here the appellant had been absent from the State at the date of the order for about two years and a half, and the prospect of his return was remote and altogether contingent. The Court, under the circumstances of the case, was certainly justified in doing what it did for the protection of the trust; as without an active trustee no investments could be made, or investments changed, or income collected for the benefit of the *cestui que trust*, who was a *feme covert*.

The only objection that could have been urged to the passage of the order is, that it was premature, that is to say, before the time had expired within which the appellant was warned by the notice of publication to appear and answer. But the order being correct in itself, and such as should have been passed at the proper time, no such objection can avail now. The order stands as if passed at the proper stage of the cause.

3. We come now to the orders of the 20th of December, 1864, and the 4th of December, 1866, finally ratifying the auditor's reports and accounts, wherein was distributed the one-fifth of the proceeds of the sales of lands to which the appellant was entitled as devisee under his father's will. The distribution was made, 1st, to the balance due on the mortgage of John T. W. Dorsey, covering the interest of the appellant in the real estate sold; and, 2ndly, to judgments of condemnation obtained in certain attachment proceedings against such interest in the lands in Howard County, by Mrs. Comfort W. Dorsey; such judgments having been obtained before the lands were sold, and were therefore binding on them at the time of sale.

Now, as to the mortgage, it is difficult to perceive upon what ground an objection can be reasonably made to its payment out of the proceeds of sale. It embraced the appellant's interest in the land sold, and the debt intended to be secured was over-due. The event had long before occurred upon which, by express stipulation, the mortgagee was authorized and empowered forthwith to foreclose the mortgage, and to sell the property embraced in it, and to apply the proceeds of sale to the extinguishment of the mortgage debt. The mortgagee was made defendant in these proceedings, and, by his answer, assented to the sale as prayed in the bill; but in such case, there was no necessity that time should be given to the parties entitled to the equity of redemption,

for the payment of the mortgage debt. *Gibson vs. McCormick*, 10 *Gill & John.*, 65. Selling the lands free of the mortgage incumbrance was certainly beneficial to all parties concerned, and as the mortgagee consented to such sale, he was entitled to assert his claim to the proceeds, and to have them applied according to the terms of the mortgage. Of this the appellant cannot complain; it is but a mode of exercising and taking benefit of the power expressly given by the mortgage itself.

Then, as to the judgments of condemnation they were strictly judgments in *rem.* for the satisfaction of which the appellant's interest in the land seized had been condemned; and, of course, the proceeds of sale of such condemned interest were equally liable to the judgments as the land itself. To have sold the land subject to the condemnations would have left it liable to immediate execution in the hands of the purchaser, which could have had no other effect than that of producing a sacrifice in the price; and inasmuch as the plaintiff in the judgments, being a defendant in these proceedings, consented to the sale of the land free of the condemnation, but holding the proceeds of sale in its stead, the Court could exercise no discretion in withholding distribution of such proceeds to these judgments. The judgments came before the Court collaterally, and their correctness therefore could not be questioned.

4. We come lastly to the order or decree of the 21st of September, 1871, passed in reference to the sale of the residue of the real estate remaining unsold under the previous order of sale. And to determine the real character of this order we must see under what circumstances it was passed.

The Court, by its order of the 7th of April, 1871, had suspended the further execution of the previous order of sale, passed on the 6th of January, 1864, until further

direction, and ordered a *subpœna* to issue to the appellant, commanding him to appear and answer the bill by a day named. This *subpœna*, though duly served, was not obeyed, and, upon application of the complainants, the order of the 21st of September, 1871, was passed, whereby the trustee appointed by the first order of sale was continued, and ordered to proceed to sell the remainder of the real estate ordered to be sold, "as if his power and authority in the premises had not been suspended by the order of the 7th of April last." No disposition whatever is made of the proceeds of sale, nor is any other subject-matter of the bill attempted to be in anywise passed upon by the order.

It is contended, that this order of the 21st of September, 1871, is in reality a final decree in the cause, and as such was prematurely passed, and without the necessary preliminary proceedings being taken upon which to found it. The bill of complaint was not taken *pro confesso*, nor was there any interlocutory decree passed, directing evidence to be taken to sustain the allegations of the bill; and if the order in question is to be regarded as a final decree, it is quite clear that it was erroneously passed, because the necessary preliminary steps were not taken. But is this order a final decree, in any proper sense of that term? We think not. The authorities do not so regard it. *Lee vs. Pindle*, 11 *Gill & John.*, 362; *Perkins vs. Fourniquet, et al.*, 6 *How.*, 206; *Pullian, et al. vs. Christian*, 6 *How.*, 209; *Craighead vs. Wilson*, 18 *How.*, 199; *Beebe vs. Russell*, 19 *How.*, 283.

The order is susceptible of but one construction, and that is, that it was simply a renewal and continuation of the former order of sale. And that being its true office and character, the same power and jurisdiction that authorized the passing of the first order of sale, authorized the passing of this last order of the 21st of September, 1871.

Upon review, of the whole record, and finding no error in any of the orders appealed from, we affirm the same, with costs to the appellees, and remand the cause for further proceedings.

*Orders affirmed, and
cause remanded.*

